UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED
2013 AUG 27  P 4:34
U.S. DISTRICT COURT
BRIDGEPORT, CONN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 3:13cr172 (SRU) |
| | : | |
| v. | : | VIOLATIONS: |
| | : | |
| | : | 7 U.S.C. §§ 6o, 13(a)(2) [Fraud by a |
| | : | Commodity Pool Operator] |
| FEISAL SHARIF | : | 18 U.S.C. § 1343 [Wire Fraud] |

INFORMATION

The Acting United States Attorney charges:

COUNT ONE
(Commodity Pool Operator Fraud)

1.  At all times relevant to this Information:

The Defendant

a.  The defendant, FEISAL SHARIF ("SHARIF"), was a resident of Connecticut and operated a business called First Financial LLC ("First Financial"), through which he solicited and obtained money from investors to be pooled in an account for the purpose of trading in commodity futures. In this role, SHARIF acted as an unregistered commodity pool operator, as that term is defined the Commodity Exchange Act, Title 7, United States Code, Section 1a(5) (2006), as amended and re-codified at Title 7, United States Code, Section 1a(11). SHARIF had experience as a commodity pool operator, and from approximately August 2003 through July 2007, he was registered with the United States Commodity Futures Trading Commission ("CFTC") as an "associated person" and a principal of "Sharif Capital Management LLC," a registered commodity pool operator and commodity trading advisor.

### Relevant Entity

b.     First Financial was a Connecticut limited liability company owned and operated by SHARIF. SHARIF operated First Financial out of his home in Branford, Connecticut.

### Regulatory Framework

c.     The CFTC was an independent federal regulatory agency charged with administering and enforcing the Commodity Exchange Act and the regulations promulgated thereunder.

d.     A "commodity pool" was an investment trust, syndicate or similar form of enterprise operated for the purpose of trading in any commodity for future delivery.

### The Scheme to Defraud

2.     Beginning in or about 2003 and continuing through September 2012, in the District of Connecticut and elsewhere, SHARIF engaged in a scheme to defraud numerous individuals who gave him money to invest in a commodity pool he operated to profit from trading in commodity futures. Over the course of the years he operated the commodity pool, SHARIF received millions of dollars of investments from various family members, friends and acquaintances purportedly for investment in the commodity pool. As part of the scheme, SHARIF made materially false representations to these investors to obtain investment capital from them. His misrepresentations related to First Financial's rate of return on investments and the manner in which investors' money would be invested. SHARIF also falsely claimed that the investors' funds were safely invested by virtue of his purported trading in commodity futures, when he knew they were not. In reality, the defendant traded in commodity futures with only a minority percentage of the funds he solicited, and the trading he actually did perform generally

resulted in losses and certainly did not generate returns anywhere near those he reported to investors. The rest of the money he raised he either took for his own use or used it to pay back existing investors, falsely claiming that it represented a return on their investment as a result of his trading activity. In sum, SHARIF operated a classic Ponzi scheme whereby he paid investors purported returns on their investments with new money he raised from other investors.

### Purpose of the Scheme

3.  The purpose of the scheme and artifice to defraud was for SHARIF to profit personally from his purported trading activities and to conceal his scheme from investors and regulators by falsifying investment contracts and periodic statements issued by First Financial, and by soliciting new money from investors to pay promised returns on existing investments.

### The Manner and Means of the Scheme

4.  It was part of the scheme to defraud that, in or about June 2003, SHARIF established First Financial for the purpose of trading in commodities for future delivery. In that regard, SHARIF established trading accounts in the name of First Financial at Velocity Futures, LLC ("Velocity Futures") and Tradestation Securities ("Tradestation"), through which to place commodity futures trades. During the course of the scheme, SHARIF made materially false representations to Velocity Futures in order to maintain the trading account.

5.  It was further part of the scheme that SHARIF solicited various persons, including friends, relatives, persons with whom he was affiliated through his religious group, and others with capital available for investment, to furnish him with money purportedly for investment in a commodity pool. SHARIF told potential investors that he would pool their money with that of others and make money through his trading activity. Although he did use some of the funds to trade in commodity futures, SHARIF used the bulk of the investment

3

capital to pay other investors their purported returns on their investments. By doing so, he created the illusion that his purported futures trading was successful and that his clients' investments were growing and paying regular dividends. SHARIF also took hundreds of thousands of dollars for his own use over the life of the scheme.

6. As a regular part of the scheme, SHARIF had his investors execute investment contracts with First Financial. These contracts contained numerous materially false statements, including misrepresentations about the rate of return SHARIF had generated for the commodity pool over the course of the preceding years. For instance, SHARIF claimed that his rate of return on investments of under $100,000 had been as follows:

    2006 – 20%
    2007 – 27%
    2008 – 21%
    2009 – 19%
    2010 – 18%

These false rates of return were designed to obtain and retain investments by giving the appearance that SHARIF was a successful trader of commodity futures. Indeed, SHARIF expressly noted that during each of the years 2007 through 2010 "the U.S. economy and the global economy [were] in a deep recession," suggesting that he was able to generate substantial positive returns despite the poor economy. These misrepresentations about the rates of return on investments had no basis in fact and were simply made up in an effort to entice investors to provide SHARIF with new investment capital.

7. In an effort to make investors believe that their money was safely invested and earning sizeable returns, SHARIF regularly made monthly payments to investors, falsely claiming the payments represented returns on their investments. In fact, the money used to pay these periodic payments did not come from investment returns, but instead came from new

money SHARIF had raised from other investors. SHARIF regularly solicited large investments from his clients, deposited the proceeds into First Financial's bank account, and promptly began issuing checks to other investors falsely representing that the money constituted returns on their investments. SHARIF also regularly made withdrawals from First Financial's bank account after an investor had given him money for the commodity pool, using the funds instead for his own personal expenditures.

8. It was further part of the scheme that SHARIF caused statements to be sent to investors from First Financial on a periodic basis. These statements were transmitted to investors either through the United States Postal Service or by email using interstate wires. These statements contained material misrepresentations concerning the rate of return investors had made on their money as well as the balance of funds in the investors' accounts. SHARIF knew that these representations were false, that the investors had not obtained such returns on their money and that he did not have funds on account to match the amounts reportedly held by the investors.

9. As part of the scheme, SHARIF also made numerous false statements to his investors designed to lull them into believing that their money was actually being invested with that of others in his commodity pool. When certain investors questioned how their money had been used and what the size of the commodity pool was, SHARIF made materially false statements about the amount of money the pool had in its account at Velocity Futures. On several occasions, SHARIF altered statements he had received from Velocity Futures to make them appear as though First Financial had substantially more money in the Velocity Futures trading account than it actually did. SHARIF then provided these phony documents to investors in an effort to allay their concerns. One of the bogus Velocity Futures statements showed a

balance of approximately $836,036.08 and the other altered Velocity Futures statement purported to show a balance of approximately $2,265,297.94. In reality, the actual balances corresponding to those periods was approximately $1,858.00 and $1,192.48, respectively. SHARIF transmitted these falsified documents to his investors by attaching them to email communications he sent via interstate wire.

10. As a result of the scheme to defraud set forth herein, SHARIF caused losses to over 50 investors totaling more than $3.6 million.

## The Execution of the Scheme

11. From in or about 2003 through approximately August 2012, in the District of Connecticut and elsewhere, SHARIF, as set forth above in paragraphs 1 through 10, knowingly acted as a commodity pool operator and in that capacity he used the United States Postal Service and other means and instrumentalities of interstate commerce, directly or indirectly, to knowingly and willfully (a) employ a device, scheme or artifice to defraud clients and participants, and prospective clients and participants, and (b) engage in a transaction, practice or course of business which operated as a fraud or deceit upon clients and participants or prospective clients and participants, including by sending a Statement of Account to an investor on or about May 31, 2012 via the Internet and/or the United States Mail, which falsely represented the amount of money the investor had on account and the purported rate of return on the investment.

In violation of Title 7, United States Code, Sections 6o(1) and 13(a)(2).

## COUNT TWO
## (Wire Fraud)

12. The allegations set forth in paragraphs 1 through 10 of Count One of this Information are hereby realleged and incorporated as though set forth in full herein.

13. From in or about 2003 through approximately August 2012, in the District of Connecticut and elsewhere, SHARIF engaged in a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent representations and promises, all as set forth in paragraphs 1 through 10 of Count One of this Information, and in the course of and in furtherance of that scheme he knowingly and willfully caused to be transmitted by means of wire communications in interstate and foreign commerce multiple transmissions of writings, signs, signals, pictures and sounds.

### The Execution of the Scheme

14. On or about June 16, 2012, in the District of Connecticut and elsewhere, SHARIF, for the purpose of executing and attempting to execute the scheme and artifice to defraud as set forth in paragraphs 1 through 10 of Count One of this Information, and in furtherance thereof, did knowingly and willfully cause to be transmitted, by means of wire communications in interstate and foreign commerce an email sent from his account, feisalff@gmail.com, to a victim which included as an attachment a bogus statement from Velocity Futures falsely showing that the balance in the Velocity Futures account at the end of May 2012 was $2,265,297.94, when SHARIF knew that the true balance was approximately $1,192.48.

In violation of Title 18, United States Code, Sections 1343.

## FORFEITURE ALLEGATION UNDER 28 U.S.C. § 2461(c) & 18 U.S.C. § 981(a)
(Wire Fraud)

Upon conviction of the wire fraud offense alleged in Count Two of this Information, the defendant FEISAL SHARIF shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all right, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Section 1343, and a sum of money equal to the total amount of proceeds obtained as a result of the offense.

If any of the above-described forfeitable property, as a result of any act or omission of SHARIF, cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property that cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

All in accordance with Title 18, United States Code, Section 981(a)(1), as incorporated

by Title 28, United States Code, Section 2461(c), and Rule 32.2(a), Federal Rules of Criminal Procedure.

UNITED STATES OF AMERICA

DEIRDRE M. DALY
ACTING UNITED STATES ATTORNEY

PAUL A. MURPHY
ASSISTANT UNITED STATES ATTORNEY